UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| | ) | |
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. |
| v. | ) ) | |
| STRATEGIC CAPITAL MANAGEMENT, LLC and MICHAEL J. BRETON, | ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) ) ) | |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission" or "SEC") alleges the following against defendants Michael J. Breton ("Breton") and Strategic Capital Management, LLC ("SCM") (collectively the "Defendants"):

## SUMMARY

1.      This case involves a fraudulent "cherry picking" scheme committed by Breton through his investment advisory firm, SCM.  Cherry picking may occur when an investment adviser, who is authorized to buy and sell securities on behalf of clients, defrauds clients by purchasing stock and then waiting to see if the stock price goes up, or down, before deciding whether to keep the trades for himself—here, in Breton's personal accounts (the "Breton Accounts"), or to put the trades into clients' accounts—here, SCM's clients' accounts (the "Client Accounts").

2.      Breton and SCM owed a fiduciary duty to SCM's clients.   Breton and SCM also promised SCM's clients that Breton's personal securities transactions would not disadvantage

SCM's clients.  In violation of their fiduciary duties and contrary to their promises, Breton and SCM routinely favored the Breton Accounts over the Client Accounts by cherry picking trades.

3.      Specifically, Breton often purchased securities of public companies through a block trading omnibus account (hereinafter referred to as a "Master Account") during regular market hours on days that those public companies were scheduled to make quarterly and/or annual earnings announcements after regular market hours.  Breton typically waited to decide whether to allocate the trades to the Breton Accounts or the Client Accounts until after the public companies made their earnings announcements.  This delay enabled Breton to assess whether the earnings news caused or would likely cause an increase, or a decrease, to the price per share of the purchased securities.  With this information in hand, Breton and SCM defrauded at least 30 of SCM's clients by cherry picking more than 200 profitable trades for the Breton Accounts, and allocating more than 200 unprofitable trades to the Client Accounts.

4.      Breton's fraudulent scheme worked: Breton made more than $1.3 million in profits derived from trades that he fraudulently did not allocate to the Client Accounts.

5.      The Defendants' conduct violated various antifraud statutes and rules of the SEC, including Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder and Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act").

6.      Based on these violations, the Commission seeks:  (1) entry of a permanent injunction prohibiting the Defendants from further violations of the relevant provisions of the federal securities laws; (2) disgorgement of the Defendants' ill-gotten gains, plus pre-judgment interest; (3) the imposition of a civil monetary penalty; and (4) such other and further relief as the Court deems just and proper.

## JURISDICTION AND VENUE

7.      The Commission brings this action pursuant to the enforcement authority

conferred upon it by Section 21(d) of the Exchange Act [15 U.S.C. §§78u(d)] and Sections

209(d) and 209(e) of the Advisers Act [15 U.S.C. §§80b-9(d) and 80(b)-9(e)].

8.      This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e) and

27 of the Exchange Act [15 U.S.C. §§78u(d), 78u(e), and 78aa] and Sections 209(d), 209(e) and

214 of the Advisers Act [15 U.S.C. §§80b-9(d), 80b-9(e), and 80b-14].

9.      Venue is proper in this district pursuant to Section 27 of the Exchange Act [15

U.S.C. §78aa] and Section 214(a) of the Advisers Act [15 U.S.C. §§80b-14(a)], because certain

of the transactions, acts, practices, and courses of business constituting the violations alleged

herein occurred within the District of Massachusetts.  In particular, at all times material to this

Complaint, SCM's principal place of business was in Massachusetts and Breton resided in

Massachusetts.

10.     The Defendants, directly or indirectly, made use of the means and

instrumentalities of interstate commerce or of the mail in connection with the acts, practices, and

course of business alleged herein.

11.     The Defendants' conduct involved fraud, deceit, or deliberate or reckless

disregard of regulatory requirements, and resulted in substantial loss, or significant risk of

substantial loss, to other persons.

12.     Unless enjoined, the Defendants will continue to engage in the securities law

violations alleged herein, or in similar conduct that would violate the federal securities laws.

**DEFENDANTS**

13.     **Strategic Capital Management, LLC ("SCM")** is a Massachusetts limited

liability company with its principal place of business in Waltham, Massachusetts.  At all times

material to this Complaint, SCM was registered with the Commonwealth of Massachusetts as an

investment advisor since 2000, and for compensation in the form of fees, advised its clients as to

the value of securities or as to the advisability of investing in, purchasing, or selling securities.

14.     **Michael J. Breton ("Breton")**, age 50, resides in Hopkinton, Massachusetts.

Breton founded SCM in 1999.  From approximately 1999 through at least August 2016, Breton

was the Managing Partner of SCM and served as SCM's Chief Compliance Officer.  Breton is a

Certified Public Accountant and a Certified Financial Planner.  Breton, through SCM and for

compensation in the form of fees, advised SCM's clients as to the value of securities or as to the

advisability of investing in, purchasing, or selling securities.  Breton is SCM's sole employee.

**BACKGROUND**

15.     During 2010 through 2016, SCM maintained Master Accounts at two different

brokerage firms ("Brokerage Firm No. 1" and "Brokerage Firm No. 2") through which Breton

was authorized to place orders, and did place orders, for sub-accounts, including the Breton

Accounts and the Client Accounts.  Breton typically first purchased securities through the Master

Account and subsequently allocated the purchased securities to sub-accounts.

16.     From approximately January 2010 through August 2016, Breton made the trading

and allocation decisions for SCM's clients through Brokerage Firm Nos. 1 and 2.

17.     From at least January 2010 through August 2016, Breton and SCM acted as

investment advisers and owed SCM's clients a fiduciary duty of loyalty, fairness, and good faith.

**DEFENDANTS' FRAUDULENT SCHEME**

18.     During at least January 2010 through July 2013 and while trading through

Brokerage Firm No. 1, Breton, acting through SCM, often purchased securities of public

companies through the Master Account during regular market hours on days that those public

companies were scheduled to make quarterly and/or annual earnings announcements after

regular market hours.   At the time that Breton entered the orders for these trades, Breton

typically did not designate whether the trades would be allocated to the Client Accounts or to the

Breton Accounts.  Instead, Breton regularly delayed allocating trades until the public companies

made their earnings announcements shortly after the close of regular market trading.  Breton then

secretly allocated anticipated profitable trades on multiple occasions to the Breton Accounts

instead of to the Client Accounts.

19.     For example, on or about January 25, 2011, Breton purchased 5,000 shares of

Fortinet Inc. ("Fortinet"), 3,000 shares of Altera Corporation ("Altera"), and 4,000 shares of

MIPS Technologies ("MIPS") shares by the close of regular market trading at 4:00 p.m. eastern

time ("ET") ("Market Close").   Breton placed each of these trades using the Master Account.

Between approximately 4:15 p.m. and 4:20 p.m. ET, Fortinet, Altera, and MIPS reported their

earnings publicly.  After the news was released, the price per share of Fortinet increased and the

prices per share of Altera and MIPS decreased during trading activity that took place after

Market Close ("After Hours Trading").  By approximately 6:16 p.m. ET, Breton allocated all

Fortinet shares to a Breton Account and all Altera shares and MIPS shares to seven and four of

the Client Accounts respectively.  In doing so, Breton allocated to himself the profitable trade

and allocated the unprofitable trades to the Client Accounts.

20.     The next year, Breton again purchased shares of Fortinet in the Master Account, but this time he allocated the shares to the Client Accounts.  Specifically, on or about October 16, 2012, Breton purchased 8,000 shares of Fortinet, as well as 8,000 shares of Cree, Inc. ("Cree"), before Market Close.  Breton placed each of these trades using the Master Account. Between approximately 4:00 p.m. and 4:15 p.m. ET, Fortinet and Cree reported their earnings publicly.  After the news was released, the price per share of Fortinet decreased and the price per share of Cree increased during After Hours Trading.  By approximately 5:22 p.m. ET, Breton allocated all 8,000 shares of Fortinet to eighteen of the Client Accounts and all 8,000 shares of Cree to a Breton Account.  In doing so, Breton allocated to himself the profitable trade and allocated the unprofitable trade to the Client Accounts.

21.     Thereafter, during at least September 2013 through March 2016 and while trading through Brokerage Firm No. 2, Breton, acting through SCM, continued to secretly allocate anticipated profitable trades on multiple occasions to the Breton Accounts instead of to the Client Accounts.

22.     For example, on or about March 10, 2016, Breton purchased 500 shares of Ulta Salon Cosmetics & Fragrance ("Ulta") and he purchased 3,000 shares of El Pollo Loco Holdings ("El Pollo") before Market Close.  Breton placed each of these trades using the Master Account. Between approximately 4:03 p.m. and 4:06 p.m. ET, Ulta and El Pollo reported their earnings to the public.  After the news was released, the price per share of Ulta increased and the price per share of El Pollo decreased during After Hours Trading.  By approximately 4:21 p.m. ET, Breton allocated all 500 shares of Ulta to a Breton Account and all 3,000 shares of El Pollo to six of the Client Accounts.  In doing so, Breton allocated to himself the profitable trade and allocated the unprofitable trade to the Client Accounts.

23.     In this manner, the Defendants knowingly, or with reckless disregard, breached their fiduciary duties to put the Client Accounts first and deceived SCM clients by engaging in a fraudulent cherry picking scheme.

### DEFENDANTS' FALSE AND MISLEADING STATEMENTS

24.     In addition, during at least 2010 through 2016, the Defendants knowingly, or with reckless disregard, made false and misleading statements and failed to disclose material facts to SCM's clients.

25.     During that period of time, SCM filed various "Forms ADV" with the Investment Advisory Registration Depository ("IARD").  Form ADV is used by investment advisers to register with Commission or state securities authorities.  Form ADV typically consists of two parts.

26.     Form ADV Part I requires information about an investment adviser's business, ownership, clients, employees, business practices, affiliates, and disciplinary events.  Form ADV Part I is available to the public.  Investment advisers are also required to prepare a narrative brochure, or Form ADV Part II, written in plain English that contains information such as the types of advisory services offered, the adviser's fee schedule, disciplinary history, conflicts of interest, and the educational and business background of management and key advisory personnel of the adviser.  Form ADV Part II is the primary disclosure document that investment advisers provide to their clients.

27.     Breton signed at least seven Forms ADV that SCM filed, and Breton provided copies of these forms to SCM's clients from 2010 through 2016.

28.     Breton, as SCM's Managing Member, Chief Compliance Officer, and trader knew, or was reckless in not knowing, that he was not permitted to allocate trades in such a way that the Breton Accounts would receive more favorable treatment than the Client Accounts.

29.     Specifically, on or about August 25, 2010, the Defendants made false and misleading statements to SCM's clients in Form ADV Part II, including, but not limited to: "[t]he managing member of SCM, Michael Breton may purchase for his own account securities he recommends to his clients.  However, in no event will Mr. Breton effect transactions on his own behalf that in any manner would put SCM's clients at a disadvantage."

30.     The Defendants also filed false and misleading Forms ADV on or about March 31, 2011, on or about October 17, 2012, on or about February 15, 2013, on or about January 10, 2014, on or about March 12, 2015, and on or about March 8, 2016.  In Part II of each of these Forms ADV, the Defendants made materially false and misleading statements including, but not limited to:

a.  "Strategic Capital Management, LLC and our personnel owe a duty of loyalty, fairness and good faith towards our clients, and have an obligation to adhere not only to the specific provisions of the Code of Ethics but to the general principles that guide the Code";

b.  "No principal or employee of our firm may put his or her own interest above the interest of an advisory client."

c.  "Our Code of Ethics is designed to assure that the personal securities transactions, activities and interests of our employees will not interfere with (i) making decisions in the best interest of advisory clients"; and

d.  "Strategic Capital Management, LLC endeavors at all times to put the interest of

its clients first as part of our fiduciary duty as a registered investment adviser."

31.     The Defendants' statements made in SCM's Forms ADV, which were provided to

clients during each year from at least 2010 through 2016, were false and misleading.  As the

Defendants well knew, these and other assurances by SCM and Breton were intended to lull

clients into a false sense of security and prevent clients from learning that Breton and SCM

routinely breached their fiduciary duties by conducting a fraudulent cherry picking scheme.

## DEFENDANTS' PROFITS

32.     Between approximately January 2010 through July 2013, and while trading

through Brokerage Firm No. 1, Breton made approximately $850,000 in unrealized overnight

profits on equity purchases before Market Close on earnings announcements days.  Had Breton

earned the same rate of return that the Client Accounts made during this period of time, he would

have lost approximately $1,500.

33.     Between approximately July 2013 through July 2016, and while trading through

Brokerage Firm No. 2, Breton made more than $520,000 in unrealized overnight profits on

equity purchases before Market Close on earnings announcement days.  Had Breton earned the

same rate of return that the Client Accounts made during this period of time, he would have

made just $40,000.

## First Claim for Relief

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5)
### [15 U.S.C. § 78j(b)]

### (Against Both Defendants)

34.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 33 above as if set forth fully herein.

35.     By reason of the foregoing, the Defendants, directly or indirectly, acting intentionally, knowingly or recklessly, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce or the facilities of a national securities exchange or the mail:  (a) employed or are employing devices, schemes, or artifices to defraud; (b) made or are making untrue statements of material fact or have omitted or are omitting to state material fact(s) necessary to make the statements made not misleading; or (c) engaged or are engaging in acts, practices, or courses of business which operate as a fraud or deceit upon certain persons.

36.     By engaging in the conduct described above, the Defendants have violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

## Second Claim for Relief

### (Violations of Sections 206(1) and 206(2) of the Advisers Act)
### [15 U.S.C. § 80b-6(1) and (2)]

### (Against Both Defendants)

37.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 33 above as if set forth fully herein.

38.     The Defendants acted as investment advisers as defined under the Advisers Act. The Defendants, for compensation in the form of fees, were engaged in the business of advising SCM clients as to the value of securities or as to the advisability of investing in, purchasing, or selling securities.

39.     The Defendants, while acting as investments advisers, by use of the mails or the means and instrumentalities of interstate commerce, directly or indirectly, knowingly, willfully, or recklessly: (a) employed devices, schemes or artifices to defraud their clients or prospective clients; and (b) engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon their clients or prospective clients.

40.     By engaging in the conduct described above, the Defendants violated Sections 206(1) and 206(2) of the Advisers Act.

**PRAYER FOR RELIEF**

WHEREFORE, the Commission requests that this Court:

A.      Enter permanent injunctions restraining the Defendants and each of their agents, servants, employees and attorneys and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, including facsimile transmission or overnight delivery service, from directly or indirectly engaging in the conduct described above, or in conduct of similar purport and effect, in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 [15 U.S.C. §§80b-6(1) and 80(b)-6(2)];

B.      Require the Defendants to disgorge their ill-gotten gains and losses avoided, plus pre-judgment interest;

C.      Require the Defendants to pay appropriate civil monetary penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and Section 209(e) of the Advisers Act [15 U.S.C. § 80(b)-9(e)];

D.      Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

E.      Grant such other and further relief as the Court deems just and proper.

## JURY DEMAND

The Commission hereby demands a trial by jury on all claims so triable.

Respectfully submitted,


SECURITIES AND EXCHANGE COMMISSION

By its attorneys,

/s/ Eric A. Forni
Eric A. Forni (MA BBO No. 669685)
Caitlyn M. Campbell (MA BBO No. 661780)
SECURITIES AND EXCHANGE COMMISSION
Boston Regional Office
33 Arch Street, 24th Floor Boston, Massachusetts
02110
(617) 573-8827 (Forni)
ForniE@sec.gov

Dated:  January 25, 2017